AMBROSE VASSE *against* JOSEPH BALL.

[S. C. 4 Dall. 270.]

A small matter of dutiable or prohibited goods, will not condemn a vessel.
Where an underwriter has it in his power to procure intelligence, he is bound to obtain it.
If a vessel be condemned as prize in a foreign court, yet if it does not clearly appear to
   be on the ground of being enemy's property, or if such a conclusion would contradict
   the grounds of the sentence, such sentence is not conclusive evidence that the insured
   has not complied with his warranty of neutrality.

THIS action was brought on two policies of insurance, dated 2d
December 1794, on the vessel and cargo of the brig Salome, Hugh
Wasson master, from Port de Paix in the Island of St. Domingo, to
Philadelphia ; the former being valued at 8000 dollars, and the latter
at 20,000 dollars.   The insurance was declared to be " against cap-
ture by the British only, or any of the subjects of Great Britain."
A clause was inserted, warranted an American bottom, and all her car-
go American property, and that the insured will prove it whatever it
may be called in question."

On evidence, the facts appeared to be these :   On the day on which
the policies bore date, the defendant inquired of the plaintiff whether
his brig had been carried into Bermuda as a prize.   The plaintiff ans-
wered him in the affirmative, and that he had just received a letter from
his captain informing him thereof ; he was fearful of a loss and
wished he had insured.   The defendant replied, that a new governor
had been appointed for Bermuda, and the piracies would end.   He
agreed with him to insure against a condemnation of the vessel and
cargo, for a premium of 10 per cent. on 28,000 dollars, at which sum
he valued them.   A written memorandum was the same evening drawn
up and subscribed by the defendant, purporting that he had insured
28,000 dollars on the brig and cargo at 10 per cent. premium, on the
plaintiff's engaging to prove the property to be American.   Previously
hereto, Captain Wasson's letter dated at Bermuda 17th November 1794,
containing intelligence of the capture of the brig, and that nine offi-
cers and soldiers had been put on board by the administration of Port
de Paix, against the will of the captain, was read or shown to the de-
fendant, as two of the witnesses swore, who were clerks of the plain-
tiff, to the best of their belief and recollection.   On the next day, for-
mal policies were delivered to the plaintiff, and the original memoran ·
dum was cancelled by the defendant.

The brig, on her outward bound voyage, carried 800 barrels of flour
to Port de Paix from Philadelphia, in consequence of an agreement
made between M. Joseph Fauchet, the French minister, and the plain-
tiff, for which he afterwards received 10 dollars per barrel.   Before
her departure from Port de Paix, on the 27th October, the French

commandant obliged the captain to receive on board his vessel nine wounded and sick French officers and soldiers to be landed in Philadelphia, and they brought with them some trifling household furniture and baggage. On the 30th October the vessel was taken by the Duke of York privateer and carried into Burmuda.

On the 19th November following, a libel was filed in the Admiralty Court of Bermuda, John Green, esquire, being judge, and the five following causes of capture were stated therein. 1. That the brig Salome, as well as the cargo, was French property. 2. That she was and had been a transport of flour and naval stores, in the service of France. 3. That she had on board dispatches for the French minister, and officers and soldiers bound to the military French hospital in Philadelphia. 4. That she had committed hostilities against the British. 5. That she had been trading at Port de Paix, while blockaded by the British troops, and must therefore be considered as adopted French property.

Hugh Wasson, the master, in his answer, denied these several charges. On the 16th December 1794, the judge pronounced his sentence, that the brig and cargo were justly captured as lawful prize, as stated in the libel, and condemned her as such, and directed that the taxed costs should be paid by the claimant. But the household furniture or baggage of the French passengers did not appear to be appraised or sold under the decree.

It also appeared in evidence, that at the time of the insurance made, the usual premium on a return voyage was 4 per cent., and that the defendant desired the plaintiff to give him every information respecting the fate of the vessel and cargo, as soon as he received it. The vessel and cargo (except the household furniture and baggage,) were fully proved to be wholly American, and the depositions taken in the Court of Admiralty assured the same facts. It was likewise admitted that formal notice of abandonment had been given to the defendant.

Three exceptions were taken to the plaintiff's recovery. 1. That the trade to Port de Paix was illegal and prohibited, and that it was not allowed under the peace establishment to carry flour to that port, and bring colonial produce from thence ; but the proof on this head did not support the objection.

2. That there was a concealment of French officers and soldiers being on board with their effects. It was contended, that the defendant did not mean to insure against such an illicit trade. The carrying of soldiers, who are enemies, is a good cause of condemnation, by the law of nations. It was proved that the defendant had required 10 per cent. premium for the insurance, without being appraised of this

circumstance.   Would he not have rose in his demands when he became possessed of this knowledge ?   And must not the plaintiff's clerks have been mistaken, when they declared their belief, that the captain's letter, containing this intelligence, was shown to the defendant.   All the cargo was warranted to be American, not only the plaintiff's part thereof, but that every other person on board, and the property of the French passengers,  though not comprised in the bills of lading, were subject to seizure.   It was of no moment whether the soldiers were forced on the captain by the administration of Port *de Paix* or not.   The assured was bound to bring the vessel within the terms of his warranty.   Such agreements must be strictly complied with.   Park. (3d edit.) 318. 1 Term Rep. 345.   If a warranty be not complied with, though for the best reasons, the policy has no effect. Parke, 320.   It is indifferent, whether the thing warranted, be or be not material.   3 Term Rep. 360.

3. The sentence in the Court of Admiralty is conclusive evidence that the brig and cargo were not American property.   A final determination in a foreign court is conclusive evidence in all cases before another court, having concurrent jurisdiction.   Bull. 245.   The decree of a foreign Court of Admiralty cannot be gainsayed. 1 Salk. 32. One discharged from an acceptance of a bill of exchange by the laws of Leghorn, shall not be charged in London. 2 Stra. 733.   An English ship was condemned as a Dutch vessel, the decree was held conclusive, and the owner was not allowed to set up this original title. 2 Show. 232. S. C. T. Raym. 473.   S. C. cited Carth. 32.   Where a vessel is warranted to be neutral, and a general sentence condemns the vessel as prize, the insured cannot recover.   So where a simple fact is charged in the libel, the decree is conclusive.   And why should an owner be restricted from contesting the property against the vendee of a ship unlawfully condemned, and yet contest the sentence against an underwriter ?   The sentence of the Court of Admiralty, as to that which is within it, is conclusive against all persons, unless reversed by the regular course of appeal.   It cannot be controverted collaterally in a civil action.   As to whatever it meant to decide, other courts must take it to be undeniable.   This appears clearly by the decision in Bernardi v. Motteux. Doug. 554. Park. 403.   And if the sentence goes on the ground of the property not being neutral, it is conclusive evidence against the insured that he has not complied with his warranty, and consequently the underwriter is no longer responsible. *Ib*. 410.   In that cause there was no express charge that the vessel was enemy's property.   The *proces verbal* was refused by the defendant to be made part of the case, which

would clearly have explained the ambiguity of the sentence. The opinion of the Court of B. R. turned on the particular ground of the confiscation appearing on the face of the sentence, and not on that of being enemy's property. Park. 413.

The cause now before the court has very different and distinct features. The libel precisely charges the brig and cargo to be French property, the decree establishes the truth of that fact, and is founded on it, as well as the other charges. Where no special ground is stated, but the ship is condemned generally as good and lawful prize, it must be taken as conclusive evidence that the property was not neutral, and the proceedings of the court abroad will not be opened in favor of the party who has warranted his property to be neutral. Saloucci v. Woodmass. Park. 413. The sentence of a foreign Court of Admiralty is conclusive evidence as to a vessel not being neutral property, when she was condemned for not having those documents which are required by the ordinances of France. De Souza v. Ewer. Park. (3d edit.) 361. In conclusion, the danger and mischiefs of opening the sentences of foreign courts were strongly pressed by the defendant's counsel.

To the point of concealment, the plaintiff's counsel answered, by admitting that their client should have shown, or at least have offered the captain's letter from Bermuda to the defendant. Two witnesses swear that it was actually read or shown to him, to the best of their memory.

There can be no doubt but the subjects of a neutral power may carry on trade in time of war, except goods not contraband, or certain articles to ports blockaded. The transporting soldiers to an enemy's port in their ships is illegal, but the removing a few sick soldiers to a neutral port is forbidden by no law; and further, the captain swears he was compelled by the administration to receive them on board. But suppose that the carrying flour to Port de Paix was illicit, it was no cause of condemnation of the brig in a subsequent voyage. The underwriter here was acquainted with the trade wherein she was engaged, and knew, or might have known the circumstances under which she was returning.

The trifling household furniture and baggage of the French passengers could be no cause of condemnation. Goods that are not imported by way of merchandise, pay no duty under stat. 13 and 14 Car. 2, c. 11. 2 Stra. 943. Under a law of the United States, passed 4th August 1790, § 23, the clothes, books, household furniture, tools and implements

of passengers are exempted from duty, on their arrival within the United States. 1 U. S. Laws, 233. A small parcel of goods brought over by mariners or passengers are deemed no part of the cargo. Bunb. 232.

[Per Shippen, J. On the authority of this case I acquitted a vessel from Rotterdam, which was seized by the collector of the customs, while I sat as judge of the Vice Admiralty Court of Pennsylvania.]

A policy on goods means only such as are merchantable and a part of the cargo. Park. 23. Indeed this matter appears evident from the admiralty proceedings ; for neither the household furniture nor baggage are included in this bill of appraisement, which enumerates particularly all the articles of the cargo.

On the last point, it was suggested, that the wording of the warranty in the policy filled up by the defendant's order, seemingly differed from the original agreement of the parties :—but this was not insisted on further than that the latter should be considered as illustrative of the former.

The counsel observed, that it was painful to reflect that some of the late decrees of the British courts of admiralty in the West Indies, were governed more by reasons of state policy and royal instructions, than by the laws of nations. Even the opinions of the courts of Westminster are not always uniform. Lord Mansfield held that insurance might lawfully be made on enemy's property. Park. 276. But Lord Kenyon has since determined that an action will not lie, either by or in favor of an a lien enemy. 6 Term Rep. 23. Park. (3d edit.) 239.

The maritime law is not the law of a particular country, but of the general law of nations. 2 Burr. 887. Lofft. 639. The writings of learned men in other countries are equally evidence of the maritime law, with the British books, and will be regarded as such in this court. Emerigon stands high as an authority, and he lays it down, that under-writers are answerable, notwithstanding the unjust decisions of foreign admiralty courts, which would have no effect on French policies ; and cites two instances wherein this point was so determined. 1 Emer. 457, § 20.

But it is contended that the present case is within the true spirit of the British resolutions. Policies are not to be construed according to the *apices juris*, but for the benefit of trade and the insured. 1 Burr. 349. They are not confined to the precise words, 2 Stra. 1250, but shall be construed according to the usage of trade. Cowp. 601. Park. (3d edit.) 392.

In Bernard v. Motteux, Doug. 554, already cited the court determined, that the French decree being equivocal, and not clearly ascertaining that the condemnation was had on the ground of the vessel's being enemy's property, a recovery was had against the underwriter. the same ambiguity occurs here.—Though a vessel be condemned as prize, yet if the grounds of the sentence appear manifestly to contradict the conclusion that she was not neutral, the court will not discharge the underwriters, by declaring that the insured has forfeited his neutrality. Park. 415.

The four last charges in the libel are inconsistent with the first. If the brig and cargo were *bona fide* French property, it was idle to state the vessel to be a transport of flour, stores or soldiers, or that she had committed hostilities against the British nation.   To consider her as real French property, and at the same time as adopted French property, by trading at *Port de Paix* while blockaded by the British, is a solecism.   The latter charges therefore evidently consider as a neutral vessel violating the law of nations, and consequently liable to confiscation ; and this opinion the judge must have entertained, notwithstanding the generality of the expressions of his decree, if the depositions taken in the admiralty are in the least attended to.

If the ground of decision appears to be a foreign ordinance, manifestly unjust and contrary to the laws of nations, and the insured has only infringed such a partial law, it is no breach of the warranty, so as to discharge the insurer. Park. 414.

It is clear, that this is *sui generis.* The circumstances attending it would form an exception to general rules respecting policies, if any such existed to obstruct the plaintiff's recovery.   He knew his vessel was captured as prize, and carried into Bermuda.   On the very day he received this inteligence from his captain, he communicated it to the defendant.  For the safety of his property, he surmounts the common premium near 1700 dollars.  What could the contracting parties mean by their agreement, but an insurance against the risk of the judge's condemnation, though the property should be clearly neutral ? What other hazard was to be run ?   The capture had taken place.  The owner warranted the brig and cargo to be Americans, of which there cannot be a shadow of doubt.   The underwriter indemnified him against the casualty of the Bermuda Court of Admiralty, believing that the appointment of a new governor would be succeeded by a new train of judicial decisions, and that the piracies under form of law, which the Americans had experienced, would terminate.   He looked however foward to the event of a condemnation, and required in such case

the earliest information, in order to institute his appeal for redress.

The court in their charge to the jury, observed, that the first exception taken by the defendant, had been abandoned, the testimony not warranting it. A concealment of the truth would certainly vitiate the policy. If credit was given to the plaintiff's witness, every difficulty of this nature would be obviated. Indeed, when the defendant knew of the letter received from the captain, he was put on his guard; and as it lay in his power to procure the proper intelligence, the duty of information devolved on himself. When the administration of justice is pure, a small matter of dutiable or prohibited goods, will not condemn a vessel in the course of trade. But the effects of the French passengers were not the ground of the decree, having neither been appraised nor sold as part of the cargo.

On the face of the decree it is objected, that all the charges in the libel are declared to be true. But it has been properly observed, that the first charge is incompatible with all the rest. The four last proceed on the supposition that the brig, though neutral property, was engaged in different services prohibited to vessels of a neutral character, and thereby incurred a forfeiture. We will not suppose the judge guilty of so palpable an inconsistency as to have founded his sentence on all the charges, or to have condemned without proof. We know with certainty that the condemnation is not specified as enemy's property, and that such conclusion would contradict the whole proceedings. Considering the sentence as ambiguous on this head, we have clearly a right to go into the examination, whether the brig and cargo were American property; and on the proofs adduced to us, no question whatever can remain, but that the whole was *bona fide* American property, excepting the trifling household furniture and baggage of the French passengers. And we moreover fully agree with the counsel, that the risk intended to be insured against, was the condemnation of the property in the admiralty, in case it was really American, according to the true agreement of the contracting parties.

Verdict *pro quer.* for 27,233 dolls. 96 cents, and 6 cents costs.

The counsel for the defendant, afterwards moved for a rule to show cause why a new trial should not be had; but the court on argument, unanimously refused the rule.

Messrs. Ingersoll, Rawle, and Du Ponceau, *pro quer.*
Messrs. Lewis, and Tilgham, *pro def.*

[A bill of exception was afterwards taken to the charge of the court, and the cause was removed to the High Court of Errors and Appeals by writ of error. The court after argument, unanimously affirmed the judgment. July Term 1797.]